BRISLIN et al. v. CARNEGIE STEEL CO., Limited.

(Circuit Court, W. D. Pennsylvania. September 15, 1902.)

No. 13.

1. PATENTS—INVENTION—FEEDING MECHANISM FOR ROLLING MILLS.

The Brislin & Vinnac patent, No. 345,953, for a feeding mechanism for rolling mills, was not anticipated, and the invention shown constituted the first successful and practicable device by which the rolling of heavy structural beams was done and the finished beams produced wholly by mechanical means. It made a distinct advance in the art, and discloses patentable invention. Claim 1 construed, and *held* infringed, and claim 2 not infringed.

2. SAME—INFRINGEMENT.

Adding to a patented machine a nonfunctional part, or a change in the position of parts, which does not change its method of operation, does not avoid infringement.

3. SAME.

Merely mechanical improvements in a patented machine which is practically operative, although they may increase its efficiency, but without changing the principle of its operation, do not avoid infringement.

4. SAME—INVENTION.

The Hanley & Richey patent, No. 352,748, for a feed table for rolling mills, discloses no patentable improvement on the combination of the prior Brislin & Vinnac patent, and is void for lack of invention.

In Equity. Suit for infringement of letters patent No. 345,953, granted to John Brislin and Antoine Vinnac July 20, 1886, and No. 352,748, granted to Patrick F. Hanley and Francis N. Richey November 16, 1886, both relating to a feeding mechanism for rolling mills. On final hearing:

James Negley Cooke, Kay & Totten, and James S. Young, for complainants.

John R. Bennett and Bakewell & Byrnes, for defendant.

BUFFINGTON, District Judge. The complainants, John Brislin and Antoine Vinnac, filed this bill in equity against the Carnegie Steel Company, Limited, charging infringement of the first and second claims of patent No. 345,953, granted them July 20, 1886, for feeding mechanism for rolling mills. The bill also charges infringement of the second, third, fourth, fifth, and sixth claims of patent No. 352,748, granted November 16, 1886, to Patrick F. Hanley and Francis N. Richey for a feed table for rolling mills, and thereafter assigned to complainants. The defenses are invalidity of the patents and noninfringement. The outcome of the case is important, in that it frees from or subjects to patent monopoly the mechanical rolling of steel beams used in modern building. Inasmuch as it is contended these patents are void, as not involving patentable novelty, it has seemed clear that a proper conclusion could be reached by us on this point only through careful study of the advance made in mechanical iron-rolling as contrasted with manual rolling by those who preceded Brislin and Vinnac. An intelligent, mechanical insight into their several devices, discrimination in estimating the comparative advance and the limitations incident to each, and a due regard to the practical effect

or noneffect they severally had, are the logical steps prerequisite to a just appreciation of what these present inventors in 1886 contributed to mechanical rolling. It will be observed that the present case charges infringement in the rolling of structural beams. In this process the initial mass of iron is so bulky, and the rolled product so unwieldy, that the rolling thereof can neither be compared to the operations of an ordinary rolling mill nor can it be appreciated by one who is only familiar with a mill of that description. In a general way, the art of rolling any size of iron consists in passing high-heated billets or blooms through different gauged roll-passes. This reduces thickness, but increases length or width. In manual rolling, men handle the metal with tongs, hooks, levers, and various appliances adapted to feed it on one side of the rolls, and catch and return it on the other. Where a stand of two rolls, technically styled "two-high rolls," is used, the return is made over the upper roll, while in a three-high stand a roll-pass both ways is made. Some kinds of iron are finished at a single stand of rolls; others transferred to an adjoining stand, which further reduces thickness and increases area. It will, of course, be apparent that, the bulkier the billets, with consequent lengthened product, the time, labor, and difficulty incident to manual handling increases. Moreover, as the process is prolonged, heat radiation either necessitates reheating of the unfinished metal; or, if rolling continues with the cooler and less pliable metal, risk of roll breaking is greatly increased. Accordingly the trend of advance has been from manual to mechanical rolling, since thereby great masses could be easily and rapidly handled, and manual labor restricted to the mere operation of the machinery used. Moreover, it must be borne in mind that in heavy rolling a change to machinery is more than mere economic gain of a labor-saving appliance. The heat radiated from these huge, fervid masses, to say nothing of the bulk to be handled in the face of this heat, created limitations to human endurance, which machinery alone could overcome. That a significant advance in such rolling art has been made is apparent in a modern beam mill. One accustomed to the picture of human activity in the ordinary old-style rolling mill, the number of men stripped to the waist, catching long, slender, red-hot bars, running backward with them as they emerge from the rolls, will be oppressed with the very weirdness of a modern mill, where, as the operations go on, the absence of men seems unnatural, and almost startling. The tremendous bulk of the metal, the ease and rapidity with which it is handled, the striking absence of men, unite to impress a thoughtful observer as no words can with the stride made in substituting mechanical for manual rolling. In view of this great change, it would seem just that those who have, from an inventive standpoint, substantially brought about such advance, should share proportionally in the gains thereof.

Without referring to all the factors in such advance, we may refer in order of date to the work of patentees to ascertain the successive stages of the inventive progress in reaching present conditions. In measuring the real advance made by successive inventors in solving the problem of continuous mechanical rolling,—and by that we mean a process where the finished product is wholly mechanically rolled,—

two facts should be borne in mind: First, the great economic gains incident to even a part mechanical process were clearly recognized; and, second, the key to the solution of the problem of continuous mechanical rolling, to wit, a pivoted table, was known to inventors, but unused, for upwards of 40 years. A pertinent illustration of these facts is afforded in the early French patent to Sauvage, No. 32,389 of 1857, given in evidence by respondent. The use of a pivoted table for rolling at a single stand of three-high rolls is shown by respondent's expert Laureau, who savs:

"I have read the French patent you refer to, and I believe I understand it. It relates to a certain arrangement of rolling mills which permits to roll plates at one heat. The train is a three-high train, the rolls of which can be moved vertically so as to vary the distance between them. In order to facilitate the handling of the plates, lifting tables are placed at the front and back of the rolls. These tables are pivoted at their outer end, and are capable of vertical motion at their inner end. This vertical motion is communicated to them by steam cylinders placed directly above the inner ends, and connected to them by means of a yoke. The operation is very simple and easily understood. The piece, being placed on the front table, passes through rolls. It is caught at the back by the back table, which, by means of the cylinder placed above it, raises the piece to the level of the upper rolls. The piece then passes back to the front, is caught by the front table, which has been raised, and lowered again to the lower rolls, etc. It will therefore be seen that the feed-table apparatus consists essentially of a frame having loose rollers upon it, and pivoted at its outer ends, the inner ends being raised up and down by a cylinder placed directly above it."

Some of the advantages of mechanical rolling are forcibly stated at that early day by Sauvage in his patent; and a recognition of the advance incident thereto will be found in the patents of many subsequent inventors. With a well-recognized object in view, and with the pivoted table (which eventually solved the problem) in their possession, the work of these inventors must be instructive in solving the question whether its ultimate solution was a mere clever use of well-known means already at hand, or involved inventive genius. Turning to an examination of successive patents, the first is that granted to George Fritz, of Johnstown, Pa.,—No. 133,771, of December 10, 1872. Therein we find a horizontal table on each side of a three-high mill. These tables are adapted to be raised to the upper roll-passes and dropped to the lower ones by individual hydraulic cylinders. Reversible propelled feed-rollers constitute the beds of these tables. These rollers were adapted on the one side of the rolls to feed the iron forward to the roll-pass, and on the other to carry it away as it emerged, and both were adapted to reverse the operation as the metal was returned. The other details of the patent need not here be referred to. In summarizing the pertinent advance made by Fritz toward mechanical rolling, we note that the vertical lift capacity of his device fitted it for use at a three-high mill, and its feed-rollers, positively actuated when the table was at the upper as well as the lower pass, enabled it to do complete mechanical feeding and rolling at a single stand of three-high rolls. The substance of his contribution to the art was a lifting table and positively actuated feed-rollers. It is also clear, even at this early stage of the art's development, that Fritz recognized what is also recognized by several succeeding inventors, that

the special mode of applying power to his rolling agencies—in his case the lifting table and the propelled feed-rollers—was regarded as a minor matter, a question of mechanical methods. Thus he says of the operation of his tables:

"The feeding tables, N and N', as shown, are raised and lowered by hydraulic cylinders operated by the rods, F and F'. * * * The tables may, however, be arranged and operated in any other suitable manner."

So, also, in reference to the mechanism propelling the feed-rollers:

"aa are shafts driven by means of the pulleys, bb. These shafts may be driven by any suitable means,—by power derived from the engine that drives the mill-rolls, or from any suitable line of shafting or engine."

In our estimate of this patent we have not overlooked the fact that Fritz provided means for laterally moving the metal so as to feed it to different passes on the lower level. But this mechanism was no part of his table, nor could the table itself be laterally moved. Under his lifting table was an auxiliary carriage, adapted to be laterally moved parallel to the rolls by a hydraulic cylinder. On this carriage were horns, which, as the table was lowered, caught the metal lying on the table, turned it over, and pushed it opposite the desired pass. This double mechanism tends to emphasize, rather than minimize, the originality of a single device wherein the lateral shifting was of the table itself, and where the extent of the shift was from one stand of rolls to another. At this point another fact may be referred to. It will be seen later an alleged infringing machine is used by respondent, among other places, at its 33-inch mills, which roll structural iron or beams. Such machine is adapted to move laterally, and operate at more than one stand of rolls. Inasmuch as it is now contended the respondent's device was a mechanical construction suggested, inter alia, by the Fritz table, it is proper to note that respondent some time previous to complainants' patents stopped manual rolling at one stand of rolls and installed the Fritz device mechanical rolling at such stand. Here was mechanical rolling at the roughing stand, but manual rolling was continued at the two adjoining finishing roll stands. Since the complainants' patents these stands were equipped with the alleged infringing device. The fact that in practice the Fritz device led them to no wider appreciation or application of its alleged mechanical adaptability is more convincing of its limit than after-contentions are of its breadth. As touching the use of the Fritz device at one stand and continuance of manual rolling beside it, we quote from testimony of Mr. Kennedy, one of the respondent's experts, and its then superintendent:

· "The Fritz tables were used on the roughing rolls of what was known as the '33-inch mill,' which rolled the ingots part way to a beam; these beams being finished on two other trains of rolls in the same train, which were not, at the time I was in the works, provided with any tables. I believe they have now, however, tables very similar to the ones used in the newest beam mill at Homestead, at what is known as the '35-inch mill.' "

Measuring by acts and results, it will thus be seen that the continuous use of the Fritz device suggested no change in the hand-rolling beside it, and led neither to its adaption to more than one stand of rolls nor to the broad conception of a continuous mechanical process,

the outcome of which was a wholly mechanically rolled product. It must, therefore, be obvious that, if 14 years later such device came into use, presumably it was not a mere mechanical adaption suggested by the Fritz device. If there was suggestion of adaptation in the Fritz device, it was not likely to lie dormant through years of inventive effort to reach such result.

The next step in time appears in the patent of Frederick J. Slade, of Trenton, N. J.,—No. 222,845, granted December 23, 1879. The device therein shown was confessedly not an original device, but simply purported to be an improvement on a patent to Charles Hewitt,— No. 24,304, of June 7, 1859. In Slade's device we find a horizontal frame or hoist, adapted to be raised and lowered to the upper and lower passes of a single three-high roll stand. On each end of the hoist, and parallel to the roll axis, is a track, on which runs a laterally shifted carriage. This lateral-shift carriage has at each side a track at right angles to the rolls, on which track travels a table to receive and deliver the metal at the upper and lower roll-passes. This table is composed of a frame in which are journalled a number of rollers, the ends of which extend beyond the table frame. The part inside the frame forms a roller to carry the metal, and the part outside, the wheels, which rest on the track and carry the roller-frame. It will thus be seen that Slade's device, as a whole, has three movements. The main frame or hoist is moved vertically so as to reach the upper or lower roll-pass. The carriage upon it is moved laterally, so as to reach any groove in either upper or lower roll-pass the table upon the carriage is moved forward or backward so as to carry the metal to and from the rolls. The propelling power and its location should be noted. The movement of hoist carriage and table is severally made by an individual, independent mechanism. One of these is stationary, but two of them are located on and move with the hoist. Thus an engine on a fixed foundation moves the hoist; a second engine, on the hoist, moves the shift carriage laterally; a third engine, also located on the hoist, reciprocates the table. The reciprocating movement of the table, owing to difference in diameter of the rollers and track wheels, gives an accelerated movement to the metal coming upon or leaving the table. Compared with Fritz, Slade's device shows no advance, and in one important element it embodied a noticeable backward step. Like Fritz, it was only adapted to operate at a single stand of rolls, and it was, therefore, no advance over the old device. But in that it lacked the Fritz positively actuated feed-rollers it was a distinct step backward. True, its feed-rollers are, in one sense, positively actuated, in that they are propelled so long as the table moves backward and forward. But at the very time when positive propulsion is needed to carry the metal to the roll-bite they not only cease to be positively propelled, but, instead of positively rolling they are stopped dead, and thus become a positive obstacle to accomplish mechanical feeding. It is evident the roll-housings, the wheels, and the frame of the shift carriage necessitate the forward roller of the table to be placed at an appreciable distance back from the rolls, and the consequent stoppage of the table at such point. When this stop point is reached, not only do the rollers cease to be positively actuated, but the stoppage

of track wheels at the roller ends prevents the roller from even passively revolving. At the very time they are needed to feed the metal, they become a positive resisting force, stopping the forward movement of the metal toward the bite of the rolls. Just how, under such conditions, the metal could reach the rolls without some other agency than the rollers, neither the patent, the proofs, nor the probabilities indicate. In that regard there is no proof by any one who saw the device operate. Two experienced witnesses, both of whom are entitled to weight, are called by the respondent. In that regard their opinions differ. Mr. Kennedy is of the opinion the device would be operative, while Mr. Wellman says it would not be so, unless the rollers were made power-driven. The difference evidently arises from the point of views. If the device is regarded as a part mechanical, part manual, one, it would seem, in confirmation of Mr. Kennedy's view, that by manual feeding of the metal in some way the device would be operative in other respects. If the device is measured by the test of doing complete mechanical rolling without manual help,—and therein lies its pertinence to the present issue,—then it would seem, in confirmation of Mr. Wellman's views, it would be inoperative as such, unless the machine was reconstructed in some way so that the rollers were positively actuated up to the feeding point. Whatever might have been possible in practically solving this speculative problem on a horizontal table such as Slade employed, we can rest assured that, to feed ingots weighing tons up an inclined table such as complainants' device shows and as the respondent employs, Slade's rollers would be inoperative. It should not be overlooked that Slade demonstrated what Fritz had previously pointed out, viz., a different mode of power application. His mechanism is not only free from roll connection or roll-imparted power, but he showed at this early day how the motive power for a laterally moved carriage and a reciprocated table can be themselves placed on and shifted with the hoist. In spite, however, of any real or seeming advance made by Slade, later development has proven that his device was at variance with the lines on which mechanical rolling of heavy articles must be done. Not only did Slade lift the entire bulk of his metal, but his hoist, carriage, table, two track sets, and his two power cylinders all were raised. Indeed, this weakness of his construction lines led to the suggestion by the patentee himself of counterweights. Following, as above noted, the general teaching of these patentees, and evidencing the view that the application of power to operate his rolling device was a matter of mechanical adaption, Slade says:

"I have described separate hydraulic engines as a convenient means of moving the lift and the cars connected with it, but other means may be substituted for them or either of them; but such modifications are too well understood to require detailed description."

The next step is the patent of Christopher Lewis, of Columbus, Ohio,—No. 247,665, of September 27, 1881. In mills of the Lewis type we find on either side of the series of sets of two-high stands of rolls sets of laterally moved tables, mounted on tracks parallel to the roll axis. On these tables are feed-rollers adapted to be actuated when the tables are opposite the desired roll-pass. The stands of rolls in each set are run in opposite directions. The several tables are

moved laterally from one stand of rolls to the next of the set by individual, independently controlled cylinders. The feed-rollers are actuated when opposite the roll-pass by gearing in engagement with the main shaft which conveys power to the rolls. The substantial advance shown by Lewis was not only in making one carriage serve two stands of rolls, but in his use of a number of carriages he carried mechanical rolling through the entire process, thus securing what he styles a "continuous rolling mill." In Lewis we thus find the idea of the process of complete mechanical rolling continuous from the ingot to the finished product. His advance, however, by its lines of construction (and this as distinguished from the mere mechanical application of power), was limited to two-high rolls, and it necessitated the use of a considerable number of carriages on each side of the rolls. Whether his device was practical or not is not shown. It is certain it left no impress on the art, for though, theoretically, it embodied a process of complete mechanical rolling, the experienced experts of respondent say they never knew of the erection of a mill of the Lewis type. He reiterates the teaching of the art found in the prior patents of the mechanical nature of mere application of power. Referring to the possibility of substituting means to shift the carriage other than those shown by him, he says, "In the place of this steam cylinder, however, I may employ drums with belts, or any other well-known means, for shifting the carriage." It will be noted also that in his use of independent, disconnected motive power to laterally shift his carriage he showed that, while practical rolling required the delivering and receiving carriages to be opposite the desired roll-pass in the rolling process, yet they could be severally made to reach each point by independent mechanism, controlled by different operators. Adapting our language to that of some of the experts in the case, we may say that Lewis showed at this comparatively early day that the compulsory simultaniety of position essential in rolling did not involve inevitable simultaniety of propelling process to reach such position. In other words, while the carriages had to operate synchronously to deliver and receive the metal, that they could reach that point through independently-controlled motors. It should be noted that Lewis' entire mechanism was mounted on stationary tracks, and was a complete abandonment of the vertical movable table principle of Fritz and Slade.

The next stage of the art is shown in the patent of Samuel T. Wellman, of Cleveland, Ohio,—No. 277,860, May 15, 1883. We here find a return to the pivoted table. On either side of the stand of three-high rolls Wellman employs a table pivotally supported at its outer end on a stationary foundation. This construction, of course, leaves the inner end free to be raised or lowered to either roll-pass. In the bed of the table are rollers adapted to be positively revolved and reversed when the inner end of the table was at either angle. The inner ends of the table are raised and lowered simultaneously by a hydraulic cylinder placed on one side of the rolls. The feed-rollers are actuated by a single reversible steam engine. Wellman adopts the general prior teaching of the art, viz., the indifference of the mere modes of power application to his rolling agents. Thus, in speaking of driving his reversible feed-rollers, he says:

"This is accomplished by means of suitable lines of shafting with gearings, which are preferably driven by means of reversible engine, F; but they may be driven by means of any suitable driving power."

He also showed the application from a fixed point of positively propelling power to feed-rollers adapted to feed at two different planes. But the important feature was the return to the use of the pivoted table, which table has proved an essential element, in combination, in the subsequent advance in heavy rolling. The importance of the pivoted table is that by releasing the inner end of the table we are enabled to elevate the metal to an upper pass without raising either the whole bulk of the metal or the whole weight of the roller frame or table. Moreover, when once the positive propulsion of the feed-roller has carried the metal to the bite of the roll, instead of the power of the roll being utilized to project the metal on a horizontal table, the gravity exerted by the inclined receiving frame is an aiding force to carry the metal down such table. While Lewis, by lateral shifting, avoids lifting the metal and its carrying frame, yet Wellman, by pivoted lifting, is enabled to make the three rolls of one three-high stand do the work of Lewis' four rolls in his two-high stands. One significant feature of Wellman's patent should not be overlooked, since it may aid in reaching a proper construction of one of the Brislin-Vinnac patent claims. The table shown by Wellman is in the patent styled a "pivoted table," and they are described, "These tables are supported at their ends in such a manner as to also allow their ends, or the ends next to the rolls, to be raised or lowered as is needed." It will thus be noted that the term "pivotal table," described as so pivoted as to permit "the ends next to the rolls to be raised or lowered as is needed," suggests pivoting, which allows proper angular movement at the inner end as fulfilling the scope of the patent. Yet in the claims such tables are described and specified as "pivotally supported at their outer ends."

So far as shown by the patents in evidence, no further step is shown in heavy mechanical rolling (with exception of a patent to Saylor, hereinafter referred to) until the Brislin & Vinnac patent in suit. As we have seen, the Fritz tables were used at the roughing stand of rolls for some time at Homestead, as they were elsewhere; but there is no proof that any one thought of rearranging or reconstructing them in combination with the elements shown by Lewis, Slade, or Wellman, so as to broaden the art of mechanical rolling. The Wellman type of mill was also widely used as a one-stand device, accomplishing as it did part mechanical rolling. But part manual rolling still continued as to the remainder of the process beside these part mechanical devices. How desirable the substitution of continuous mechanical for manual rolling was is apparent from a consideration of what, for example, the manual rolling of structural iron involved. Such manual rolling may be thus described. In the framework of a mill, on either side of, parallel with, and a considerable distance above, stands of three-high rolls, were placed a number of tracks, adapted each, or sometimes by pairs, to carry a laterally moved frame on a wheel. Suspended from such frame was a cylinder usually actuated by water pressure, and to the piston was attached a sway

or chain having pivoted at its lower end a long lever or hook. Each of these sways was operated by a hooker-man, and as the metal emerged from the rolls it passed between two rows of hooker-men to be caught and supported on the sway hooks. As the rear end of the metal cleared the rolls, it was raised or lowered for return through the upper or lower roll-pass of that stand of rolls, or it was moved laterally by means of the sway pulleys (actuated in some cases by cylinder motive power) to an adjoining stand of rolls for further treatment. By this process the respondent on its 23-inch mill, with 13 men, rolled 100 tons at a labor expense of $84, and its maximum output was less than 44 tons per hour. On its 33-inch mill, with 17 men, it rolled 100 tons at a wage rate of $125, and the output was 40 tons per turn. Brislin and Vinnac were both ironworkers, and were acquainted with the difficulties incident to this work. Brislin had given up millwork, but Vinnac continued as roller. In answer to the question how they came to design the patented device, Brislin says:

"From the increase in size of the iron Vinnac had been in the habit of rolling, they rolled it one length when he was working at the rolls, then they increased it to two lengths. Vinnac and me got to talking one day about the length of iron, and we concluded that we would try and get up a machine and do away with the hooks, and we started to work on a model in January, 1884."

The proofs show that this model was placed in the hands of a patent solicitor to prepare specifications. This work was either so carelessly or ignorantly done that the application was rejected before it was considered at all on its merits. The crudity of the application is referable possibly to the fact which the proofs show, namely, that it was hurriedly filed under stress of threatened prosecution after protracted delay. The fact of its rejection being wholly on formal grounds should be borne in mind,—not to affect the claims which, as granted, are, of course, the sole measure of the patentee's rights, but to prevent such formal rejection having any undue effect in narrowing the claim. In the specification the difficulties incident to raising and lowering the metal between the passes of one stand of rolls and to transferring it laterally to another stand are set forth as follows:

"In heavy rolling the labor attendant upon elevating the heated iron and moving it laterally for the several passes required in the process of rolling is very laborious, and the difficulty attendant upon said manipulation causes a loss of time, and at the same time a loss of heat, thereby causing the iron to be more difficult to roll; and the stiffening of the iron by the cooling process due to said loss of time results in the breaking of the mechanism connected therewith."

The advance of the art in lifting is conceded, viz., "Mechanical contrivances have been constructed and used for the purpose of vertical lift of the heated iron in the operation of rolling," and the invention of the patentees in the device for both lifting and transferring laterally is stated, viz.:

"Our invention has for its object not only the vertical lifting of the heated iron, but also the lateral movement of it in the process of rolling; and our invention consists in a lifting mechanism and laterally moving mechanism, combined with rolls of a rolling mill, for the vertical lifting and lateral movement of the heated iron in the process of rolling it."

In the device shown are two carriages, one at each side of the rolls, and adapted to move on stationary tracks parallel with the roll axis. Those carriages are moved simultaneously from one stand of rolls to another by power conveyed through a shaft adapted to engage, through lever control, with the lower string of rolls. Upon each of these carriages is a mounted table pivoted near its outer end, and the distance to its inner end is such as to permit it to reach both upper and lower roll-pass. Such inner end rests upon and slides along a bar suspended by chains in front of the rolls. One of these bars is on each side of the rolls. These bars have a supporting chain, and the chains of both bars connect and are drawn up and released by a single mechanical contrivance, so that the inner ends of the tables rise and fall together. It will be noted—and this fact we deem helpful and explanatory in construing the language used in the body of the patent in describing the invention—that the table-lifting mechanism is not only entirely independent of the rolls as a whole, but it has no connection whatever with individual parts of the rolls, to wit, with the lower string of rolls, which conveys power to laterally move the carriage, with the middle string, which propels the feed rollers, or with the idling upper string. In other words, the table-lifting mechanism—and this is a significant fact, and one to be fully appreciated—is entirely independent of roll connection.

On the application as finally presented, three claims were allowed. The first and second are involved in this case, and are as follows:

"(1) The combination, in a rolling mill, of rolls, a carriage, a roller-frame therefor for feeding to the rolls and pivoted at its outer end, means for laterally shifting said carriage and roller-frame and devices for inclining said roller-frame on its pivot, so as to vary the feed of the latter to the rolls; substantially as set forth.

"(2) The combination, in a rolling mill, of carriages arranged at each side, and provided with roller-frames pivoted at their outer ends, means for laterally shifting said carriages, and devices for simultaneously inclining said roller-frames; substantially as set forth."

As stated, the defenses set up are nonpatentability and noninfringement. Turning first to the question of patentability, we have the prima facies arising from the grant of the patent. But we have not alone the presumption arising from such grant, but our examination convinces us that the patent was rightfuly granted. In the Brislin-Vinnac device we find for the first time in heavy rolling—and if such thing existed in lighter forms of rolling it has not been deemed sufficiently relevant to be called to our attention—the combination of a pivoted table, adapted to feed metal at both the upper and lower passes of more than one stand of such rolls. Throughout the mass of proofs in this record, the testimony of experts familiar with the practices of the art in this country and abroad, this one fact stands out in bold relief, unquestioned: no one prior to Brislin and Vinnac thought of, much less embodied in form, the coupling of a pivoted table and a movable carriage. As we have seen, Fritz had positively propelled feed-rollers, but his horizontal table as well as the entire metal bulk had to be lifted. Moreover, his device, being immovable laterally, was limited to a single stand of rolls. Indeed, in common with other devices which bodily lifted the metal mass by sheer power

as contrasted with tilting tables, where only the end is lifted, we think the Fritz device belonged to another type of mechanism. It was not—and, we think, rightfully so—cited by the patent office in the consideration of this application. Slade's device lacked a pivoted table, and its lateral movement was limited to the different grooves of a single stand of rolls. His device had neither a pivoted table nor positively actuated feed-rollers adapted to feed up an inclined table. Lewis had positively actuated feed-rollers and lateral shift capacity, but its use was restricted to two-high rolls. Wellman, on the other hand, with his positively propelled rollers and inclined table, could feed to three-high rolls; but, restricted as it was to a single stand of rolls, it did not solve the problem of continuous, complete mechanical rolling. Conceding that all the elements of Brislin and Vinnac were in themselves old, yet it must be conceded that they were the first to take the separate, individual elements of advance in the rolling art, and so combine them as to accomplish continuous, complete mechanical heavy rolling, and to make possible a new product, to wit, a machine-rolled heavy beam. The separate steps of Fritz, of Slade, of Lewis, and Wellman, securing lateral movement, vertical movement, and tilting movements, were each deemed worthy of patent protection and reward. Why, then, should the steps of Brislin and Vinnac, which carried this advance to the culmination in combining lateral and vertical in such a way that both movements could be used in each form of roll to which prior inventors had succeeded in applying but one of such movements, be deemed not only worthy of patent protection, but of such favorable regard as the broad and important field it pertained to would warrant? A device which transfers from the field of human toil to mechanical work the handling of huge masses of iron heated to a point almost prohibitive to human handling is a beneficent factor that is not to be measured by the economics of a mere labor-saving machine. While the motive and reward of the inventor is a monetary one, his work, measured by beneficent results, may arise to the dignity of the humane. At all events, in this case it fulfilled the statutory requirement of being useful and novel. That the continuous and complete mechanical rolling of an ingot weighing tons to a finished product a hundred feet in length is a noteworthy mechanical feat; that it marks a great advance step, will be conceded. That the potent factor in that advance is the use of a pivoted table laterally movable is apparent. Whether credit for the result is due or shall be awarded these patentees, this fact is established beyond doubt as noted above. Indeed, we do not understand it is questioned that these men were the first to point out this combination. And the significance of this novel combination cannot be minimized. It was not the mere placing together of two elements, each of which in the new relation continued to travel in its old orbit, and accomplish the same result it had done singly. The union of the two left neither the same as before. The lateral movement of the carriage widened the sphere of the table so that it served a plurality of roll-stands. The vertical motion of the pivoted table doubled the sphere of the carriage, in that, while remaining on stationary tracks, it could reach a roll-pass on a level other than its own. The power to move existed in one factor. The power

to reach existed in the other. The union of the two gave to the moving factor the power to reach; gave to the reaching factor the power to move. In this flexible roller we have a new mechanical factor; in its work we have a new result, viz., a machine rolled product. Thus the two elements of a lateral shift carriage and a pivoted table, elements old in themselves, known and used for years, when united accomplished a novel result in a novel way. It is strenuously asserted by skilled engineers called by the respondent that the construction of such a device as Brislin and Vinnac's was a mere mechanical assembling or adaption of existing devices. We cannot accede to that view. In the absence of any one making such a device, possibly the best proof of what the skill of the art might have done is what it did do. In that regard the patent to Saylor, referred to above, is highly instructive. This patent—No. 320,973—was granted June 30, 1885, to Louis F. Saylor. It will be noted as the outgrowth of a period which had the benefit of all that Fritz, Slade, Lewis, and Wellman had done. At that comparatively late date the difficulties incident to rolling heavy and structural shapes was well understood. To place ourselves in the then point of view, and thus appreciate what Brislin and Vinnac accomplished, it is well to notice how Saylor, presumably familiar with the art, sought to solve the problem of heavy mechanical rolling,—a problem, the solution of which we are now told was purely mechanical. This patent, which was placed in evidence by the respondent, recognized the difficulties incident to the old system, and the efforts made to solve them. "In operating old-style rolling mills," says Saylor, "one of the most laborious and severe parts of the work is that which has been known as 'hooking,'—that is, raising and lowering the blooms and partly rolled rails as they are run through the rolls,—and much time and labor have been spent to produce satisfactory machinery for performing the work." The object of this invention, as stated by him, is substantially the same as Brislin and Vinnac's. He continues: "This is the object of my present invention, and said invention principally consists in tables mounted on tracks running along parallel with the rolls, provided with rollers mounted on swinging arms, and mechanism for driving said tables back and forth and raising and lowering said rollers." To accomplish his purpose, Saylor, it will be noted, passed by the pivoted table,—an efficient factor in all subsequent advance,—and returned to the horizontal table with the lift of the entire metal bulk. By a most complicated mechanism he causes the rise of a system of swinging arms, which extend over the entire surface of the table, and these tables he makes movable from one roll-stand to another. Without entering into a description of the mechanism of Saylor's device, it is sufficient to say that to the disinterested mind it is cogent proof of the fact that the solution of the problem of mechanical rolling was by no means simple.

This backward step of a presumably practical man like Saylor in passing by the pivoted table and returning to the horizontal table, in imparting lateral motion to a horizontal instead of a pivoted table, shows that the conception of the application of the pivoted table to

the broader field of continuous rolling was a step not apparent even to inventors, to say nothing of mere mechanical improvers.

The discriminating student of all the devices—Fritz, Slade, Lewis, Wellman, and Saylor—will see that the gist and substance of progress lay in the several types of carriages, tables, and rollers used, and not in transmitting power to them. So far as power went, Slade had shown that individual cylinders could be used placed on the carriages themselves. In thus locating the power at the point of application on a movable carriage, the question of the transmission thereof was eliminated as a mechanical difficulty. The vital question was the use to be made of the power in the movement of tables and rollers, not the obtaining of power. It is not often the thread of inventive advance is so clearly traceable as in the present case. Fritz gave the vertical movement to the horizontal table and propelled rollers. In placing the motive power on the carriage, Slade gave freedom from power transmission problems. Lewis gave lateral movement to the horizontal table, and Saylor gave both vertical and lateral movement to such table. Sauvage and Wellman gave a pivoted table, and Brislin & Vinnac released such table from its fixed pivoted point, and by the movable carriage gave it a combined lateral and vertical movement. And this dual capacity of vertical and lateral movement in a pivoted table is the objective point in this case. Eliminate it, and there is nothing left worth contending for. Thus regarded,—and without reference to the claim obtained,—we think the substance of Brislin & Vinnac's invention consisted, not in gearing and power transmitting mechanism, but, as stated, in the patent "in a lifting mechanism and laterally moving mechanism, combined with rolls of a rolling mill, for the vertical lifting and lateral movements of the heated iron in the operation of rolling it." Such being the substance of the invention, we next inquire what claims were granted, for they, and they alone, are the measure of the inventor's right. The elements of the first claims are: (1) Rolls; (2) carriage; (3) a roller-frame therefor, (a) for feeding the rolls, and (b) pivoted at its outer end; (4) means for laterally shifting said carriage and roller-frame; (5) devices for inclining said roller-frame on its pivot, so as to vary the feed of the latter to the rolls. It is contended on behalf of respondent: First, that the first element "rolls" are, in the combination of the claim, the means for laterally shifting the carriage and roller-frame, and that this claim is therefore restricted to a device in which the power is roll transmitted; second, that the element "a roller-frame * * * pivoted at its outer end" excludes pivoting at any point of the outer portion or end of the frame except the literal extreme end. In construing this claim it will be observed that it is not for the device of the patent as a whole. The operative device of the patent, embodying a carriage on each side of the rolls, with the means for simultaneously raising the inner ends of the roller-frames, is embodied in the second claim. The combination embodied in the first is for a mechanism on one side of the rolls. It cannot do complete mechanical rolling. It has but one carriage; it can operate on but one side of the rolls. Possibly it covers a single stand of rolls, for, no lateral movement whatever of a pivoted table being shown in the prior art, there is noth-

ing to necessitate this claim being limited to two stands of adjoining rolls. It will therefore be seen, the claims not being for the entire operative device of the patent, we are not forced to adopt a construction inferable from the claim being of that character. In accordance with the statutory requirement that patentees shall disclose the "best mode in which they contemplated applying their principle," these patentees showed a roll transmission of power in utilizing their principle of a laterally and a vertically moved pivoted table; but it seems to us a fair reading of the claim—a reading in keeping with the substantial character of the disclosure made by the patent—does not restrict it to that specified element of power supply. It is a familiar canon of construction that that construction should be followed which gives force to every part of an instrument. If the element "rolls" be used in the operative sense of means of power transmission for laterally shifting the carriage and roller-frame, then the fourth element, "means for shifting said carriage and roller-frame," have no effect. It will not do to say that the "means" here referred to are the gearings and shafting between the rolls and the carriage, for it will be observed that the roll shafts are not the origin of power, but are mere power transmitting shafts—transmitting power. They are embraced in the term "means for shifting said carriage and frame," because in function that is precisely what they do; hence if the element "rolls" is to be construed as a power transmitter to the carriage, the fourth element is a useless repetition. It is urged, however, that this construction is imperative, because the patentees have so defined their invention. The language of the patentees, "our invention consists in a lifting mechanism and laterally moving mechanism, combined with rolls of a rolling mill, for the vertical lifting and lateral movement of the heated iron in the operation of rolling it," respondent claims make the combination of the rolls with the lateral moving mechanism to affect the lateral movement of the iron the invention disclosed. The fallacy of such construction is apparent when we reflect such reading would make the combination of the rolls with the lifting mechanism to effect the vertical lifting of the iron the invention in that regard. But this is not the fact. The rolls do not enter in combination in any way to operate the lifting mechanism. The roller frame is lifted by an independent mechanism. Moreover, it will be seen that such reading is at variance with the facts in another regard. It will be observed that the power to laterally move the carriage is transmitted from the engine, not through the medium of the rolls generally, but solely through the lower roll as a shaft. So, also, the power to propel the feed rollers is transmitted through the middle roll as a shaft. The upper roll is an idler, conveying no power. In all other places through the patent where the term "roll" is employed the entire stand is meant, and where a single section or roll string is referred to it is designated as such. Thus, "In the process of rolling it is necessary to elevate the iron so that it will pass through between the upper and middle rolls"; "in moving the iron from one groove to another, and from one set of rolls to another set." So, also, what are the rolls is expressly defined: "In the accompanying drawing, A, B, C are rolls mounted in housings, D, D, and provided with the usual coupling and adjusting mechanism.

To the couplings of one of the rolls is attached a shaft, E, on which are mounted bevel wheels." "In the construction of the machine it will be readily comprehended that the lift and side moving mechanism, T, is arranged on each side of the rolls." "1, 2, refer to parallel bars, a pair of which are arranged at each side of the rolls." "The iron to be rolled is placed upon the lifts, T, and the roller will carry it forward on one of the lifts to the rolls, and from the rolls on the other lift." It will thus be seen by these selections, which embrace all mention made of that element, that the term "the rolls" apply to the entire stand, and where one roll section is defined it is in some way specified as such, viz., "the upper," "middle roll," "one of the rolls." It will also be noted that this "one of the rolls" to which is attached the shaft, E, is the one which, with the shaft, E, transmits power to propel the feed-rollers. We but follow the body of the patent and the instructions of the patentee when in the claim we give to the term "the rolls" the definition of the patent. "A, B, C are rolls mounted in housings, D, D, and provided with the usual coupling and adjusting mechanism." To give "the rolls" of the claim the meaning of the roll string, B, which transmits power to laterally shift the carriage" is to fly in the face of the meaning given that term in the body of the patent. Moreover, it will be noted that in describing and lettering the device the power transmitting mechanism is described not as the rolls, but as "transmitting shafts" on one part of which the rolls are placed. Take, for example, patent Fig. 2. The shaft, E, which transmits power to the feed-rollers, is not only so lettered at the left of the figure, but its lettering is carried through not one, but two, stands of rolls, and is placed at the extreme right of the figure. So, also, in the case of shaft, E', which transmits power to laterally move the carriage, not only is such shaft made to extend clear through the rolls, and the lettering placed at both ends, but in speaking of it as the power transmitting agency there is absolutely no mention made of the fact that a string of rolls is located upon it, or, indeed, any mention made of rolls. The significance of roll omission or reference thereto in describing the carriage moving mechanism warrants its citation: "On the shaft, E', is mounted a wheel, V, which meshes into wheels, V, V, on shafts, W, W, which are provided with couplings or clutches, X, X. The shafts, W, W, have also mounted upon them wheels, a, b, which are arranged to be shifted through the medium of rods, c, and lever, d, for the purpose of bringing the wheels, a, b, at will, into gear with the bevel-wheels, e, on the shaft, f, on which are mounted wheels, g, which mesh into racks, h, h, attached to the lifts and side-moving mechanism." We have, then, the fact that the patentee has in the body of the patent defined the term "the rolls" not as meaning a power transmitting device, but what is commonly meant by the term, viz., "rolls mounted in housings, and provided with the usual coupling and adjusting mechanism." Such defined, ordinary meaning can be given said term in the claim. The patentees have also specified in the patent their "means for laterally shifting said carriage and roller frame" without mention or inclusion of the rolls therein. Such meaning can be awarded that element in construing the claim. It would, therefore, seem neither necessary nor just that the term "rolls" in the claim

should be held to be "means for laterally shifting said carriage and roller frame," and that by construction there should be injected into the term "rolls" a meaning at variance with its use and definition in the patent, and that the means for lateral shifting should have injected into it an element functionless in itself, and which the patentee, by his omission to mention, had not made a named or needful element. Such a narrow, technical, and unwarranted limitation of this claim, which it must be remembered is for a single carriage, would allow a gross infringer to escape infringement by extending shafts E and E' direct to an engine, instead of passing through the medium of rolls, functionless, as rolls, to carry power to the carriage and feed-rollers. We cannot join in thus stripping of patent protection this novel and useful carriage. There is nothing in the claim which demands such judicial annihilation of property rights. The invention of the carriage embodied in this claim is one of merit. There is nothing in the prior art or in the language of the claim itself to make this forced, narrow, and unnatural construction imperative. Using the terms in their ordinary meaning, we give to it a construction in accord with the substantial character of the invention, disclosed for the first time in this patent. This construction gives to the term "rolls" its ordinary meaning, and does not include in it the "means for laterally shifting said carriage." The latter is a separate, individual element of the combination, and should be treated as such.

We next seek the meaning of the claim term "a roller-frame * * * pivoted at its outer end." The respondent contends that any pivoting which is not at the extreme outer end of the table avoids the claim. The specifications as originally filed made no mention of a pivoted table. On September 22, 1885, the patent was rejected without action on its merits, the office saying, "Action on the merits of the case must await proper amendments." On March 20, 1886, it was again rejected, the office saying, "Action on the merits must await proper amendment." In this latter rejection the attention of the patentee was called to the lack of description of the table, viz.:

"The description of this table is incomplete. Nothing is given as to the construction of the feed table itself, how it moves laterally, whether the racks, h, are attached to the table, what the table travels or is carried on, whether it is pivoted at its rear, or where, or what."

It will be noticed the office made no requirement as to pivoting at the outer end. Its inquiry only suggested possible pivoting (not at the outer end), but at its rear. And it was specifically inquired how the roller frame, while being lifted, could be moved laterally. Its inquiry was: "By what mechanism is it that the lifting mechanism is connected to the table so that the latter may move laterally, yet be operated upon in any position by this lifting mechanism?" In other words, the office could not understand how a table could be lifted vertically and moved laterally at once. An answer to its last question solved both inquiries. The amendment stated:

"The chains, j, are connected at their extremities to a horizontal bar, 5, said connection being made outside of the limit of the lateral movement of the carriage, T. Inasmuch as the inner end of said carriage only rests upon said bar, the carriage can move freely and laterally relative thereto when power is imparted to the chains, j, j, the bars, 5, 5, will be elevated, and cor-

respondingly elevate the inner end of each carriage, T; the shaft, 4, constituting a pivotal bearing for each carriage."

It is clear from the context that this language was used to explain the capacity of the frame to be lifted and moved laterally at the same time, and that freedom of the inner end of the frame to move up and along was the subject of the paragraph. That it could move along was shown in that it rested on the cross-bar. That it could move up with the raised bar was shown by the fact it was pivoted. In the Century Dictionary the word "outer" is defined as "opposed to inner." We think it is in this sense it is used in the claim. The inner end is free to move, the outer end is pivoted; and, thus constructed, they form a frame functionally fulfilling the claim element, "devices for inclining said roller-frame on its pivot, so as to vary the feed of the latter to the rolls." It would, therefore, seem that the phrase "pivoted at its outer end" is not a limitation to make the extreme tip of the outer end the sole place of pivoting, but rather a descriptive word, showing a table pivoted so far from the inner end as to allow such an angle of inclination to such inner end of the roller-frame that, in the language of the claim, it will "vary the feed of the latter to the rolls." About the year ——— the respondent began to install the devices complained of, and used them for rolling structural iron. No account is given of the origin of the idea. We are simply told the designs were prepared by its mechanical engineers. Whether there is any connection between that fact and the fact that the attention of several of its officials had been called to the Brislin and Vinnac carriage does not appear, and is a matter of no moment. The carriage was already in operation at the works of the Wheatland Iron Company at Wheatland, Pa. Shortly after the patent was granted, that company examined it, took a license, and placed it in its mills at Wheatland, where it was successfully used for the manufacture of skelp iron for pipes. It will be noted that in the device constructed under this license the Wheatland Company substituted a rod and lever arrangement for the chain and bar roller-frame lifting device of the patent. They also pivoted their roller-frame some distance from its outer end. These facts are not unimportant, as showing that practical iron men— "those skilled in the art," to whom the patent was addressed—made changes in mechanical details of construction and power application, and that such changes were not regarded as departing from the scope of the patent. The carriage installed by the respondent was placed on two lines of tracks parallel to the axis of two stands of three-high rolls adjoining each other. Therein we have in a rolling mill the first specified elements of the first claim, viz., "rolls," an "a carriage." On this carriage is pivoted "a roller-frame." In its 23-inch mill, the roller-frame is pivoted very near the rear end, as will be seen from the testimony, which we quote in full. Ritchey, a workman at the mill, was asked:

"Q. What kind of tables are used on this 23-inch mill? A. Traveling feed tables. Q. How many of these traveling feed tables are used on this 23-inch mill. A. Two; one on each side of the rolls. Q. How are they made to travel? A. By means of electric power on the tables. Q. Are these tables raised and lowered at one end? A. They are raised and lowered at the front end by means of a hinge at the back or rear end. Q. Are both of these tables

hinged at their rear end? A. Yes, sir. Q. About how far is the hinge located from the extreme rear or outer end? A. I should judge from 2 to 3 feet."

Duncan, a roller on the 23-inch mill, testified to the same effect:

"Q. How do they handle the metal at present on this 23-inch mill? A. By traveling tables. Q. Are these tables adapted to travel from one set of rolls to another? A. Yes, sir. Q. How do they do such traveling? A. By means of electricity on the table. Q. How are these tables raised and lowered from one roll pass to another? A. By hydraulic cylinder on one end of the table. Q. Please state whether or not these tables are pivoted, and, if so, where? A. They are, close to the outer end."

On cross-examination on this point his testimony was:

"Q. As a matter of fact, none of the tilting tables at Homestead are pivoted directly at their outer ends; this is correct, is it not? A. Yes."

McCague, a roller employed on the 23-inch mill, testified on cross-examination:

"Q. At Homestead the 23-inch mill tables are pivoted almost at the middle are they not? A. No, sir; they are very near the ends in the 23-inch mill. * * * Q. Is there any advantage of pivoting them at the end instead of the middle? A. Yes, it moves quicker. Q. It requires more power, does it not, to lift it when it is at the end? A. Yes, sir; I believe it does. They have a large cylinder and plunger connected with it. Q. As a matter of fact, none of the tables at the Homestead works are pivoted directly at the end, but all of them have their pivotal points somewhat removed from the end of the table, have they not? A. Yes, sir."

It will thus be seen that the roller-frame of the 23-inch mill is pivoted so near the extreme outer end that these witnesses describe it as "close to the outer end," "very near the ends," "two to three feet" distant. In the absence of any suggested difference in operation secured thereby, it would seem this frame was—in the literalism of the claim—"pivoted at its outer end." As to the 33-inch mills, the proofs show a similar construction. McCague testifies:

"Q. Where is the pivot on the table in the 33-inch mill located? A. The pivot on one of the tables is very near the outer end, and the other is near toward the center."

Duncan says:

"Q. Are the tables on the 33-inch mill the same as to operation as those on the 23-inch mill? A. Yes, they operate practically the same. The only difference is that one of the tables on the 33-inch mill has its pivotal point about two-thirds of the way from its inner end, and located near the outer end."

Ritchey says:

"Q. About how far from the back end of the table of the 33-inch mill is this one table hinged or pivoted that you say is located at the back end of the table? A. Well, I never measured it, but I should judge it would be 4 or 5 feet; it might be a heap less, and then it might be more."

Clark, an expert witness for complainant is asked:

"Q. At what point in the length of the defendant's roller frame do you find it is to be pivoted? A. At a point somewhat beyond its center of gravity, outward, approximately, I should say, about three-fifths of the distance from its inner end."

The testimony of the respondents does not disclose where the pivoting is in their machines. Mr. Laureau, their expert, produces a model

in court. He does not state from which mill it was modeled. Obviously, it was not the 23-inch mill. In reference to it Mr. Laureau says:

"The feed table is placed upon this frame, and it is suspended at the point which is not quite in the center, so as to allow the table to tilt downward at its inner end against the roll. The overhanging end at the other side of the point of suspension is such as to offer a partial counterbalance for the heavier end toward the rolls."

When asked, "Do you agree with the complainants' expert, Mr. Clark, that in the defendants' feed tables the roller frame is pivoted 'about three-fifths of the distance from its inner end,' as compared with being pivoted at the outer end in the Brislin and Vinnac feed tables," he says, "I think that Mr. Clark is substantially correct in his statement." The pivoting of these frames being at a sufficient distance from the inner end to thereby enable the roller frame to vary its feed to the rolls, we are of opinion the device embodies the third element,—"a roller frame therefor for feeding to the rolls, and pivoted at its outer end." We are also of opinion that the extension beyond the pivoting is merely mechanical, nonfunctional, and that such extended part is one whose presence or absence would not affect the operation of the device. The expert witnesses for respondent have not attributed to this extension any functional duty. At most, it is a mere counterweight or a mechanical aid in handling long beams. As we have seen, one of them simply says, "The overhanging end at the other side of the point of suspension is such as to offer a partial counterbalance for the heavier end toward the roll." On the other hand, the complainants' proof shows that, while this counterbalance necessitates less power to raise the inner end, absence thereof makes a quicker-acting device. The statement of complainants' expert that "the outer end of a frame may be removed, and yet the device remain operative," is not denied or questioned. It would, indeed, be a curious perversion of the patent law if the respondent's 23-inch mill frame, pivoted from two to three feet inward, should be held not to be pivoted at its outer end. And, if it fall within the patent, it would seem clear that an extension added to such outer end would not avoid infringement. "Addition to a patent machine or manufacture," says Walker on Patents (page 294, § 347), "does not enable him who makes, uses, or sells the patented thing with the addition to avoid the charge of infringement. This is true even where the added device facilitates the working of one of the parts of the patented combination, and this makes the latter perform this function with more excellence and greater speed." So, in Electric Co. v. La Rue, 139 U. S. 607, 11 Sup. Ct. 672, 35 L. Ed. 294, it is said, "Even if the defendant does use the retractable spring in aid of the torsional spring, it could not thereby escape the charge of infringement." In reference to the phrase, "pivoted at the outer end," Mr. Kennedy, an expert for the respondent, frankly says, "I think it would be fair to construe this language as prohibiting the pivoting of the table at its outer end." If, then, in further prohibition, we remove the pivoting so far from the inner end as to allow an angular tilting of the roller-frame "so as to vary the feed of the latter to the rolls," such pivoting is at the func-

tional, if not the extreme physical, outer end of the frame. If the roller-frame is extended beyond this functional outer end, such extension beyond is unnecessary, nonfunctional, indifferent. As was well said in the case of Cahoon v. Ring, 1 Cliff. 620, Fed. Cas. No. 2,292, and repeated in Machine Co. v. Murphy, 97 U. S. 125, 24 L. Ed. 935:

"Inquiries of this kind are often attended with difficulty; but if special attention is given to such portions of a given device as really does the work so as not to give undue importance to the other parts of the same, which are used only as a convenient mode of constructing the entire device, the difficulty attending the investigation will be greatly diminished, if not entirely overcome."

As we have seen, the elements of a laterally moving carriage and a roller-frame pivoted thereon are the combining, co-operating factors constituting the novel combination of this claim. The remaining elements, while essential in combination, are purely mechanical, in that they simply vitalize or utilize the capacity of the combination table. The elements, "means for laterally shifting said carriage and roller-frames," and "devices for inclining the roller-frame on its pivot," are mechanical expedients to carry power to the table to operate it. Neither the means to shift the carriage nor the device to incline the roller-frame, which are used by these patentees, are made the subjects of individual claims. We cannot well see how they could have been. The elevation of the Brislin-Vinnac table is by the use of an independent individual mechanism. Raising a table in this way was no novelty. Fritz raised his tables by hydraulic cylinders; Slade raised his by hydraulic engines; while Wellman showed the use was optional of either a steam or a hydraulic cylinder for that purpose. So, also, Brislin and Vinnac utilized roll-conveyed power as their means of laterally shifting their carriage and propelling their feed-roller. There was no novelty in their going to the rolls for power. As we have seen, Lewis, to propel his feed-rollers, took power from a main shaft, which also propelled the rolls, while Saylor took direct from the rolls the power to both laterally and vertically move his horizontal table. This is conceded by the respondents. Its expert, Mr. Laureau, says:

"The relation of the Saylor device to claims 1 and 2 of the Brislin and Vinnac patent is very close, and, with the single exception that the Saylor tables are not pivoted at their outer ends, the claims alluded to are an exact description of the Saylor table. There is the same combination of rolls, carriages, roller-frame, means for laterally shifting carriage, and devices for allowing the roller-frame to deliver metal to both upper and lower passes. * * * The Saylor device is therefore substantially the same as the Brislin and Vinnac device."

It will thus be seen the novelty of Brislin and Vinnac's combination lay not in their commonplace means and devices for transmitting, but in the novel combination table they operated by, such power. It would, therefore, seem the patentees in their claim for this carriage were not restricted to the exact means and devices for power transmission they used, but were entitled to include all existing mechanical equivalents therefor as fairly within the scope of "means for laterally shifting said carriage and roller-frame" and "devices for inclining the roller-frame on its pivot." We have seen the re-

spondents use the combination of a carriage and the roller-frame pivoted thereon; that they place it on tracks parallel to rolls, and to that extent have availed themselves thereof to secure the advantage of the combination shown in the claim. It remains, therefore, to inquire whether in the use of means to laterally shift and devices to incline the roller-frame they so obtain power as to avoid the claim. Brislin and Vinnac used an independent cylinder, and transmitted power through chains, pulleys, and bar to the front end of the table, which was then raised by power and depressed by gravity. In accord with a well-recognized engineering principle that the most direct application of power is the best, the respondents placed a hydraulic cylinder on their carriage directly over the front end of the roller frame, and raise it by power and depress it by gravity. This was but the use of a common, ordinary power source in a well-known manner. Slade had shown to the rolling art that the engine to furnish power in moving could be placed on the shifting carriage. It therefore seems to us that the respondents' device for raising the front end of their roller-frame is a mechanical equivalent of the complainants', and that it accomplished the same purpose in substantially the same way. Indeed, the mechanical construction used by respondents is conceded by Mr. Laureau to have been used years before by Sauvage on his stationary pivoted table. Speaking of that table, he says:

"As compared with the Brislin and Vinnac patent, this apparatus shows a feed table pivoted at its inner end, * * * the vertical motion of its front end being given by a cylinder which pulls. * * * In defendant's table I find that it is pivoted, and that it moves up and down in the same manner as the table described in the French patent in evidence."

The fact that in complainants' device the raising chains are connected, and the roller-frames rise simultaneously on both sides of the rolls, while the respondents' roller-frame operates independently, and without reference to the carriage on the other side of the rolls, makes no difference, so far as this claim is concerned. The first claim, as we have seen, is for a single carriage, and the device is not one for raising roller-frames on both sides of the rolls, but for "inclining said roller-frame on its pivot." In the Brislin and Vinnac device the power to laterally shift the carriage is obtained from a roll shaft through gears and shafting as is also their feed-rollers' propelling power through another such roll shaft. The device is such that the power is conveyed at the same time to each of the carriages on either side of the rolls. The respondent makes a direct application of power. By means of an extension telescopic pipe they carry steam from an outside supply to the carriage, and place thereon an engine, which moves the carriage and also propels the feed-rollers. If we are influenced by form and led by appearance, we can see a wide difference between complainants' and respondent's device. If we measure by substance, we find them substantially the same. The patentees were rollers, and the rolling part of the problem—and that was the vital part—they solved successfully and on the lines which all roll-beam mills have followed. They were not engineers, and, while their device was operative, as we have seen at Wheatland, it

requires no special mechanical knowledge to see wherein their appliances for furnishing power to their carriage were crude, and afforded room for considerable improvement In that regard we may quote with approval Robinson on Patents (volume 1, p. 185), where it is said: "Mechanical perfection is the achievement of the artisan, rather than the inventor, and does nothing to develop or to illustrate the idea of the invention. Possibilities of greater excellence in shape, location, arrangement, material, or adjustment do not affect the fact that the inventor has produced a practically operative means, and all such possibilities are legally embraced in what the inventor already has accomplished. Nor is it necessary that the invention, as a means, should be incapable of further improvement by the exercise of additional inventive skill. If it accomplishes the end desired, it is perfected invention, although some newly generated idea, or some better mode of application, may reach the same end, and in a more perfect manner. It is enough that the inventor has devised a means, has put his thoughts into practical and useful form, and placed where the public can at once employ it,"—and refer to Sessions v. Romadka, 145 U. S. 29, 12 Sup. Ct. 799, 36 L. Ed. 609; The Telephone Cases, 126 U. S. 1, 8 Sup. Ct. 778, 31 L. Ed. 863; Independent Electric Co. v. Jeffrey Mfg. Co. (C. C.) 76 Fed. 991. The mechanical changes made by the respondents, while extensive in appearance, have left unchanged the gist of the combination in the flexible table adapted to lateral and vertical shift. That remains precisely as Brislin and Vinnac conceived it. To the layman these changes seem radical. Not so to the engineer. Mr. Kennedy, respondents' expert, when asked whether it was not within the province of a skilled engineer to take the Brislin and Vinnac device, and adapt it to independent operation, said, "It would be very easy to take the Brislin and Vinnac patent and adapt it to get this independent operation." Speaking of a date a few months later than Brislin and Vinnac's patent, but several years before the respondent's alleged infringing device was built, he said:

"It having been old and well known to every one in the slightest degree familiar with mechanical subjects to use motors mounted on moving machines as a well-known mechanical equivalent to fixed motors attached to these machines by suitable connection, such a substitution could not, in my opinion, involve any invention whatever."

Summing his views on the relation of fixed and movable motors, he says:

"It would be utterly absurd to think of there being any invention involved in substituting a motor mounted on a moving mechanism for a fixed one, adapted to draw it along by interposed connections, or vice versa. The interchangeability of these devices was as apparent and well known as that of cogwheels and band pulleys. Which device is better to use for any purpose is simply a matter of ordinary judgment."

So also, Mr. Lareau, speaking of the substitution in another patented device of the self-contained movable motors for the stationary mechanism of the Brislin and Vinnac carriage, says:

"The application of the motors as shown in the said patent was simply the substitution of a simple and well-known mechanical appliance for a more complicated intervening device to communicate motion. The application of

motors directly to the object to be moved was a thing so common at that time that mere ordinary mechanical skill was sufficient to make the substitution."

It is thus apparent on respondents' own showing that in substituting movable for fixed motors they were simply bringing to bear, in their use of Brislin and Vinnac's carriage, plain, well-known engineering practice. In seeking compactness of plant and direct application of power, their engineers did not revolutionize,—did not change the table proper; they simply followed the lines of modern installation in order to use it. As Mr. Laureau says, "Practice had led to the recognition of the fact that, the nearer the motor was placed to the work to be performed, the more economically could this work be done." It will therefore be seen that the difference between the mechanical roller of Brislin and Vinnac and that of respondent does not lie in the carriage proper. That essential feature is the same, pivoted laterally and vertically working in both structures. The difference lies in the means used to apply operative power to the carriage by a change and substitution of power transmitting devices. When trained engineers tell us that the interchangeability of such devices was apparent, and that which shall be used was simply a matter of ordinary judgment, it must be apparent that when these patentees, in compliance with the statutory obligation, chose one of many well-known methods to operate their table, they did not empower an infringer to take the other well-understood alternative methods, and use them to avoid their invention. After full consideration, we have concluded the first claim of this patent is infringed, and that it should be so held.

In view of what has been said, the remaining points require but brief notice. The second claim calls for a combination of carriages on each side of the rolls, and embodies devices for "simultaneously" inclining the roller-frames of the two. The simple answer to this claim is that respondent has no such device. It employs no device for doing that which is made an element of this particular claim, viz., "simultaneously inclining said roller-frame." The element of compulsory simultaneity is here made an element of a device to operate both carriages. This the respondent does not do. As to the Hanley and Richey patent, we are of opinion that the defense of invalidity because of nonpatenability must be upheld. It consists simply of the substitution on a Brislin and Vinnac carriage of movable motors of various kinds for the fixed motors shown in the Brislin and Vinnac patent. This substitution to form a combination with such a table was, in our judgment, a mere engineering problem, and involved no inventive faculty. We have already quoted in part the language of Messrs. Kennedy and Laureau to emphasize our view of what was involved in a similar substitution made by the respondents. Their testimony was given upon the question of the validity of the Hanley and Richey patent. We agree with their conclusions, and content ourselves by here embodying them as expressive of our views. Mr. Kennedy says:

"It having been old and well known to every one in the slightest degree familiar with mechanical subjects to use motors mounted on moving ma-

chines as a well-known mechanical equivalent to fixed motors attached to these machines by suitable connections, such a substitution at the time mentioned could not, in my opinion, involve any invention whatever. For instance, it was customary at the time to operate traveling cranes, the motions being transmitted from fixed motors by means of cords or chains, the operator remaining at one spot, as well as to operate similar cranes by means of motors mounted on the crane and traveling with it, the operator at the same time being carried on a platform attached to the crane, the advantage of this construction being that the operator traveling with the crane was in better position to see his work and place his crane properly than he could possibly be if he remained in one fixed location. This is precisely the same advantage, and the only advantage, that is gained by the Hanley and Richey construction, as compared with the construction of the type of the Brislin and Vinnac. There are, of course, other advantages in the Hanley and Richey, as described, over the Brislin and Vinnac, but these are due to better detailed design, and not inherent in the type of machine."

Mr. Laureau says:

"Such a substitution as the date of application of the Hanley and Richey patent would certainly not have involved an invention. The application of the motors as shown in the said patent was simply the substitution of simpler and well-known mechanical appliances for a more complicated intervening device to communicate motion. The application of motors directly to the object to be moved was a thing so common at that time that mere ordinary mechanical skill was sufficient to make the substitution. It was within the reach of every one versed in the art, and it had been [done?] so often that the application did not call the inventive faculty in requisition."

Let a decree be drawn in accord with the views expressed in this opinion.